Argued 7 January; decided 27 January, 1902.

## STONE *v.* LADD.

[67 Pac. 413.]

SPECIFIC PERFORMANCE—EVIDENCE.

The evidence in this case seems to show that a deceased aunt intended to give her nephew part of her farm, but neglected to do so before her death—it does not satisfactorily show that the transfer was to be in settlement of any debt.

From Multnomah: JOHN B. CLELAND, Judge.

Suit by Hiram S. Stone against William M. Ladd, executor, for the specific enforcement of a contract. There was a decree for defendant, from which plaintiff appeals. AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. Wm. D. Fenton* and *Wm. Y. Masters.*

For respondent there was a brief over the name of *Milton W. Smith,* with an oral argument by *Mr. Smith,* and *Mr. Wm. L. Brewster.*

MR. JUSTICE WOLVERTON delivered the opinion.

This is a suit to require the specific performance of a verbal contract alleged to have been made and entered into by and between Hannah M. Smith, now deceased, and her nephew, the plaintiff herein, whereby, in the latter part of the year 1892, in consideration of labor and services rendered, an accounting respecting which was then had, she agreed to deed to plaintiff fifty acres of land, being the same described in the complaint. The questions involved are principally of fact, and, the testimony being voluminous, we will be unable to do more than state our deductions in many instances, without an extended discussion of conflicting details.

In 1872 the deceased was the owner of twelve hundred or thirteen hundred acres of land in proximity to Fairview, Multnomah County, Oregon, which she utilized principally as a dairy farm. The plaintiff went upon it in that year, and

remained thereon, caring for the farm, until the spring of
1880, when, as he says, he had a settlement with Mrs. Smith,
and that she paid him for his services in land. The land re-
ferred to is a one hundred and sixty-acre tract, located near
Mount Scott, and was conveyed April 12, 1880, the deed recit-
ing a consideration of $3,000. The plaintiff subsequently went
East, but returned to the farm in April, 1881, where he re-
mained until December, 1883. In the meanwhile, according to
his statement, he worked and managed the farm as before for
Mrs. Smith; cared for the stock, consisting of one hundred
milk cows and twenty-five to forty head of other stock; and his
wife did the cooking for the hands employed, numbering from
five to thirteen. For this work the plaintiff testifies that his
services were worth $100 and his wife's $20 per month. He
further testifies that from December, 1883, to the year 1892 he
performed services for the deceased, at her request, as general
superintendent of her farm; that she consulted him frequently
during that time, and was desirous that he should keep the run
of it,—see what the tenants were doing, etc.,—which he did,
and made frequent reports to her; and $10 per month is
claimed for such services for nine years and six months. The
farm was occupied during the time by tenants named Lull,
Glenn, Rankin, and Arneson. Rankin left the place unexpect-
edly, and plaintiff was required for a period of about ten days
to employ the requisite help and take care of the dairy, which
services he states were worth $75. Soon after he quit the farm
in 1883, plaintiff sold and delivered to Mrs. Smith, a span of
mules and a horse, which he valued at $350. Other than the
services mentioned, he testifies that he was always doing what
he could for her, working and looking out for her business in-
terests as she requested; and that during all this time all he
received for his services was a living, which he estimated to
have been worth from $200 to $300 per annum.

He further testifies that in the latter part of the year 1892,
or early in 1893, they had an accounting together, touching all
these services; that they "jumped at the amount," and that
she agreed to deed him the land in dispute in settlement

thereof; that he took possession of the whole fifty-acre tract at that time, part of which was in meadow and part in brush. There were twenty-six and sixty-seven hundredths acres of the meadow, but it was usually designated as the "40-acre meadow." This was inclosed, but only twenty-one and sixty-five hundredths acres of it are included in the tract in controversy. The inclosure, by its conjunction with other fencing, part of which plaintiff constructed in 1887, formed another inclosure, containing about six acres, on the east of the meadow, four and ninety-two hundredths acres of which are contained in the fifty-acre tract, and the balance lies north of it. Plaintiff cut brush on this inclosure about 1887. In explanation of how he came to complete the inclosure and to cut the brush, he says that Mrs. Smith had formerly agreed to let him have the land, and that the matter had been talked of for ten years or more. In the spring of 1893 Mrs. Smith leased to one John Thomas all of her farm, saving one hundred and thirty-six acres and a fraction, south of the Oregon Railroad & Navigation Company's railroad, the lease bearing date April 1. Upon the same day plaintiff executed to Thomas a lease for something like one hundred and fifty acres, lying in the bottom adjoining the land of Mrs. Smith, for a term of years identical with the lease given by Mrs. Smith; the expressed consideration being $1. Thomas understood that he was to get the whole tract, but says that when the lease was drawn the land south of the railroad was left out, and Stone's lease was given to compensate him therefor. This did not serve to satisfy him, however, as later developments indicate, and it was arranged, plaintiff says, by the request of Mrs. Smith, that he should let him have eight tons of hay in the barn and twenty-two tons on the meadow in the shock, which was furnished; and Thomas testifies that he went into possession of the meadow in the fall,—October 1, 1893,—and has remained in possession of it ever since, cultivating it, and taking the hay off, and pasturing it; and has also had such possession of the other lands of Mrs. Smith lying south of the railroad as they were susceptible of, being virtually commons, the fencing having gone down so as

to be of little consequence. Plaintiff says that at the instance
of Mrs. Smith he allowed Thomas to turn his stock in on the
range and meadow and to take the hay from the meadow every
year afterwards, but that he never surrendered his possession
of the fifty-acre tract, or any part of it, and that he has always
continued in the possession of the six-acre inclosure. Subse-
quent to the death of Mrs. Smith, Thomas, at the instance of
the executor, rebuilt and repaired much of the fencing about
the outlying lands, as well as about the meadow, so as to utilize
them for pasturage, and cut the brush off the fifty acres lying
south and east of the meadow inclosure. It also developed that
during the time since the latter arrangement plaintiff has been
permitted to turn his stock upon the bottom land, while at the
same time he and Thomas have been pasturing their stock con-
jointly, more or less, upon the land south of the railroad and
within the meadow inclosure.

On May 7, 1896, Mrs. Smith wrote to plaintiff as follows:

"Dear Hiram: To get that land matter settled up, you may
survey out the fifty acres for yourself,—this to include that
notch into Bowman's farm, and enough besides to make up the
fifty acres in a straight line so as not to leave a notch on my
land."

In pursuance of this letter plaintiff employed a surveyor,
and had the land surveyed and platted. Mrs. Smith was made
aware of the survey, and expressed herself as satisfied with it,
but the execution of the deed was deferred from time to time,
and she died without making it. Plaintiff is supported in a
manner in his statement touching the agreement of Mrs. Smith
to deed him the land through her admissions. Albert Stone, a
brother of the plaintiff, says she told him in June prior to her
death—she having died in October, 1896—that she had a bar-
gain with Hiram, and that she had agreed to deed him the piece
of land in controversy for services rendered; and Mrs. Red-
clift, G. R. Shaw, and Andrew Snover testify to admissions of
like character. E. Arneson testifies that Mrs. Smith told him
that she intended to make such a conveyance to Stone for his
services while he (witness) occupied the place, which was prior

40 Or.—39.

to the alleged settlement and agreement to make the deed. Some inconsistent admissions are shown, but, not being against her interests, they are in the nature of self-serving declarations, and we have not considered them. Plaintiff's contention, however, is much shaken by the testimony of Mr. Milton Smith, who had long been the attorney and adviser of Mrs. Smith, and who relates that plaintiff came to him after her death with the letter of May 7, and claimed to him at that time that Mrs. Smith had agreed to exchange this tract with him for his land lying in the bottom, being the same that he had leased to Thomas; but said, however, that it was not his intention to make any trouble; that he came to see about the survey, and wanted the estate to pay for it; that he had previously sent Judge McArthur to him to have the exchange made, who produced the letter, or a copy of it, at the time; and that an exchange of the eighty acres never was in fact talked of, nor did he ever make mention to him of any accounting with Mrs. Smith. Plaintiff admits sending Judge McArthur to Mr. Smith with the letter, but says that his talk with Smith touching an exchange of land was with reference to the eighty-six-acre tract, and not the land in dispute. This suit was begun May 13, 1899, and Smith says he never had any intimation of plaintiff's present claim until the complaint was filed. On January 21, 1891, Mrs. Smith made another conveyance to plaintiff of eighty-two acres, being part of the bottom land which was leased with other land by plaintiff to Thomas, the consideration named in the conveyance being $3,000. Plaintiff says that this conveyance was intended as a gift to his oldest son, but that at his request it was deeded to him so that he might be able to use it.

We are not satisfied, after a careful and painstaking survey of the testimony adduced, that the plaintiff has established a sufficient consideration to support the alleged verbal agreement by Mrs. Smith to deed the tract of land in controversy to him; and he must fail, as, without a consideration, specific performance cannot be enforced. If we accord to plaintiff the

full amount that he claims for services rendered Mrs. Smith, we have a statement of this nature:

For services from April, 1881, to December, 1883, at $120 per month..$3,840
From December, 1883, to the alleged settlement, 9 years and 6 months,
    at $10 per month............................................... 1,140
For taking care of stock 10 days while Rankin was a tenant.......... 75
Value of mules and horses.......................................... 350

    Aggregating  ..............................................$5,405

During all this time plaintiff had a living for himself and family, which he says was worth from $200 to $300 per year. Placed at $300, which is probably not unreasonable, for twelve years and two months, would amount to $3,650, which, being deducted from the $5,405, leaves a balance in plaintiff's favor of $1,755. So that, reduced to its final result, this sum would represent the consideration. But plaintiff names no sum as the result of their accounting. He says that they "jumped at the amount," as they had always done, and Mrs. Smith, to compensate him, agreed to deed the land. The only prior settlement alluded to is the one made about April 12, 1880, when she conveyed to him the one hundred and sixty acres at Mount Scott, but it is doubtful whether this was a sale to satisfy a prior obligation, for the plaintiff says "she might have given it to me; yes." He says, however, she owed him for work on the place and looking after the farm, but when asked how much she owed him, he was unable to say, and stated further that neither one was very particular, or kept things very close, as it pertained to business matters between them. On July 2 following she conveyed to him a tract of sixty acres adjoining her land south of the railroad on the east, upon which plaintiff and wife have been making their home. This he redeeded to her, and she at once conveyed the same to his wife, with twelve acres added. This was a gift outright, without other consideration to support the transfer. Now, again, on January 21, 1891, Mrs. Smith conveyed to plaintiff eighty-two acres of land, being the tract lying in the bottom,—scarcely two years prior to the alleged settlement. This was first intended for his son, but, he not being of age, plaintiff prevailed upon her to

deed it to him, so that he might be able to use it. He has subsequently disposed of it, together with a smaller tract adjoining, in payment of his indebtedness, amounting to over $1,600; thus indicating that the land was of considerable value at the time it was deeded to him. Now, if Mrs. Smith was indebted to plaintiff at that time in the large sum claimed, it is highly improbable that she would be giving to him or his son this valuable tract of land, and at the same time leaving prior matters of business between them unsettled. The transaction comports very naturally with plaintiff's statement of their manner of doing business,—that neither of them was "particular at all."

Two years later comes the alleged settlement, whereby it is stated that she agreed to deed plaintiff the fifty-acre tract in question in settlement of a prior indebtedness. There was an arrangement between them whereby he was to have the use of the meadow. This is highly probable from the fact that Mrs. Smith reserved the land south of the railroad from the lease to Thomas, and that plaintiff leased to Thomas his land in the bottom for the same length of time at a nominal rental. But whatever possession plaintiff obtained of the meadow at that time was subsequently, about October 1, 1893, surrendered to Thomas, who has had possession ever since, exercising possessory acts, open and notorious, without protest from the plaintiff. There was never any segregation of the fifty-acre tract, and possession taken of it by the plaintiff. This could not very well have been the case, as the survey was not made until more than three years later, and he does not claim to have entered into exclusive possession of the remaining lands south of the railroad. There was some talk of an exchange of lands between Mrs. Smith and plaintiff, and there is a controversy whether the exchange involved the fifty-acre tract or the eighty-six acres lying between it and the railroad. But, be this as it may, it is fairly shown that the plaintiff's first claim, as it respects the letter directing a survey of the land in question, was not compatible with the idea of an agreement by Mrs. Smith to deed it to him in payment of a former obligation arising from a settlement. Plaintiff went to Mr. Milton Smith,

the attorney for Mrs. Smith, shortly after her decease, with the letter; and Smith says he claimed then that Mrs. Smith had agreed to exchange this land for his land in the bottom. Plaintiff denies that such was the conversation, which he says alluded to an exchange of the eighty-six-acre tract, but he nowhere states that he, in his interview with Smith, claimed his right to a deed was based upon the agreement which he seeks to have specifically performed. The institution of his suit was probably the first definite claim that he made upon the theory of a verbal agreement to convey. It seems that Mrs. Smith talked of deeding plaintiff the meadow long prior to the alleged accounting, and this in acknowledgment of plaintiff's services rendered her, plaintiff says, for ten or fifteen years. Plaintiff built some fencing inclosing a part of the land in dispute, and cut some brush thereon, as far back as 1887, and the deed was then talked of; but it was not until 1893 that the alleged agreement was entered into. The next step was three years later, when the survey was directed, and it was yet three years later when the attempt was made to enforce it. It had been ten years since the larger portion of the alleged indebtedness had accrued, namely, the items of $3,840 for services of himself and wife and the sale of the horses and mules, when the alleged accounting was had. This illustrates the character of the dealings between the aunt and nephew. Mrs. Smith had been liberal in helping the plaintiff all along, and had been grateful to him for such services as he had rendered her in the management and conduct of the farm while in the possession of lessees and otherwise, and she intended, doubtless, as her letter of May 7, directing the survey, proves, to deed him this land in dispute; but it was manifestly to be in the way she had formerly deeded him lands,—as a gift; possibly as an exchange,—and not for any adequate former services that he had rendered her, nor to discharge any prior legal obligation. Their dealings with each other and plaintiff's admissions repel most persuasively the idea that there was ever any such an accounting that any definite sum was fixed as the amount that Mrs. Smith owed the plaintiff. They ''jumped at the

amount,'' which is not so much as named or stated, and she agreed to make the deed. This was not more than had been talked of since long prior to the alleged agreement and up to the date of Mrs. Smith's death, and it cannot serve to support the alleged agreement to make the deed, saying nothing of possession and other matters of part performance, necessary to take the case out of the statute of frauds. The decree of the court below will therefore be affirmed.          AFFIRMED.

Decided 9 September, 1901.